20-mj-358 HB

2020R00251

UNITED STATES DISTRICT COURT

ss

COUNTY OF RAMSEY

## AFFIDAVIT

I, Laura Gulick, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am employed as a Special Agent with the Bureau of Alcohol Tobacco & Firearms (ATF), and have been so employed since September 2014. I am currently assigned to the St. Paul Division. The mission of the ATF is to protect communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, and other crimes.  I have graduated from the 26-week combined Criminal Investigator Training Program at the Federal Law Enforcement Training Center, and the Special Agent Basic Training at the ATF National Academy. I have successfully completed courses in criminal investigations, tactical training in executing searches of persons and premises, courses in federal firearms violations, federal arson laws, federal explosives laws, and other general investigative matters.  In my capacity as an ATF agent, my responsibilities include, but are not limited to, investigating violation of federal laws related to weapons and violent crime under Titles 18 and 26 of the United States Code.

2.     Before joining the ATF, I was employed as an Intelligence Research Specialist for Homeland Security Investigations for 8 years.  As an Intelligence

1

2020R00251

Research Specialist, I assisted in hundreds of investigations regarding federal crimes, including firearms violations and narcotic violations. Prior to my employment with HSI, I was an active duty Military Intelligence Officer in the United States Army.

3.      This affidavit is submitted in support of the following:

(a)      a criminal complaint alleging that SAMUEL ELLIOTT FREY ("defendant FREY"), Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 (collectively, the "co-conspirators") have conspired with each other to commit arson on property used in interstate commerce, in violation of Title 18, United States Code, Section 844(i), all in violation of Title 18, United States Code, Section 371 (Count 1); and further alleging that defendant FREY has attempted to destroy by fire property used and engaged in interstate commerce, in violation of Title 18, United States Code, Section 844(i) (Count 2) (the **"Subject Offenses"**); and

(b)      an application for a warrant to search defendant FREY's residence located at 64XX Winnetka Avenue North in Brooklyn Park, Minnesota 55428, described further in Attachment A (the **"Subject Residence"**), for evidence, fruits, and instrumentalities described further in Attachment B, concerning the **Subject Offenses**.

4.      Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact in this investigation known to me and to others. This affidavit is based upon my personal knowledge, information provided to me by other law enforcement agents and

2

2020R00251

investigators, my review of records, interviews of witnesses, and my training and experience, among other things. I have also included facts described in the Hennepin County Complaint charging Officer Derek Chauvin as described below, as well as reports by the media, including video footage, that have been publicly aired between Monday, May 25, 2020 and today, and updates that have been provided by local, state, and federal officials and agencies.

## FACTUAL BACKGROUND

5.      On Monday, May 25, 2020, in the early evening, someone called 911 and reported that a man had used a counterfeit $20 bill to purchase items from the Cup Foods convenience store at 3759 Chicago Avenue in Minneapolis. At 8:08 p.m., Minneapolis Police Department (MPD) Officers Thomas Lane and J.A. Kueng arrived with their body worn cameras (BWCs) activated and running. The officers learned from store personnel that the man who passed the counterfeit $20 bill was parked in a car around the corner from the store on 38th street.

6.      BWC video obtained by the Minnesota Bureau of Criminal Apprehension shows that the officers approached the car, in which three individuals were sitting. George Floyd was in the driver's seat, another man was sitting in the front passenger seat, and a woman was sitting in the back seat. Officer Lane approached from the driver's side and interacted with Mr. Floyd. Officer Kueng approached from the passenger side and interacted with the front seat passenger. At some point during these interactions, the officers ordered Mr. Floyd to exit the car and placed him in handcuffs.

3

2020R00251

7.      Over the next several minutes, officers moved Mr. Floyd from a seated position on the ground, to a standing position outside the squad car, and then to sitting in the squad car. During this period, Mr. Floyd was telling officers that he was claustrophobic and could not breathe. Also during this time, MPD Officers Derek Chauvin and Tou Thao arrived in a separate squad car to assist.

8.      At approximately 8:19 p.m., Officer Chauvin pulled Mr. Floyd out of the passenger side of the squad car, Mr. Floyd went to the ground face down, still in handcuffs. Officer Kueng held Mr. Floyd's back and Officer Lane held his legs. Officer Chauvin placed his left knee in the area of Mr. Floyd's head and neck. During the next few minutes, Mr. Floyd repeatedly said "I can't breathe." The three officers who were holding him down, stayed in their positions. After approximately five minutes, Mr. Floyd stopped moving. The three officers remained in their positions for nearly three more minutes. Officer Chauvin removed his knee from Mr. Floyd's neck at approximately 8:27 p.m., after an ambulance and emergency medical personnel arrived. The officers placed Mr. Floyd, who appeared unresponsive, onto the gurney. Mr. Floyd was pronounced dead at the Hennepin County Medical Center.

9.      During this incident, multiple bystanders gathered around the scene. At least one bystander filmed the incident, and shortly after it occurred, posted a video on social media that soon went viral.

10.     By Tuesday morning, May 26, local and national news outlets had picked up the story about Mr. Floyd's death, and by Tuesday afternoon, thousands of

4

2020R00251

people were gathered in the area of 38th and Chicago Avenue to protest the treatment of Mr. Floyd.

11.    Following the mostly peaceful protests that occurred on Tuesday night, the cities of Minneapolis and St. Paul, and some surrounding communities, endured three nights of violence and destruction. Between Wednesday afternoon and the early hours of Saturday morning, following several organized and peaceful protests, hundreds of individuals carrying on into the night vandalized and looted local businesses and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, hurling objects and other measures. On Wednesday night, for example, individuals broke into the Target Store and Cub Foods near the East Lake Street/Hiawatha intersection in Minneapolis, near the site where the police encountered Mr. Floyd on Monday, vandalized and looted the businesses, and then set fires inside. Numerous other businesses in the neighborhood, and in the City of St. Paul, were looted or partially destroyed by vandalism and/or fires. On Thursday night, the Minneapolis Third Precinct police building was heavily damaged by fire.

12.    As of Saturday morning, May 30, the Minneapolis Star Tribune reported that approximately 246 businesses across the Twin Cities area had been vandalized, looted, partially or completely destroyed by fire, or otherwise severely damaged.

2020R00251

## PROBABLE CAUSE

### *Fire Scene Investigation at 1360 University Avenue West, Unit 105, Saint Paul, Minnesota*

13.     On Thursday, May 28, 2020, one of the buildings damaged by fire in the Twin Cities area was a commercial building located at 1360 University Avenue West, Saint Paul, Minnesota.   That commercial premises is a strip mall structure that contains within it a small business called Great Health and Nutrition.

14.     Per its website's mission statement, Great Health and Nutrition is an independent supplement retailer, specializing in holistic health, sports nutrition, and natural detox products.   On June 3, 2020, an ATF Special Agent contacted JR, the owner of Great Health and Nutrition. JR told ATF personnel that he primarily purchases his product inventory from NOW Foods.   According to information from NOW Foods—including from its website (*see* https://www.nowfoods.com/now/about-now/facilities)—NOW Foods is "one of the natural products industry's premier manufacturers" with "several manufacturing and distribution facilities in the United States and Canada."     More specifically, NOW Foods is "headquartered in Bloomingdale, Illinois, where [its] corporate offices and primary manufacturing facility are located. NOW also operates a … distribution facility in the neighboring town of Roselle [Illinois]" as well as "a manufacturing and distribution facility in Sparks, Nevada."   Great Health and Nutrition also receives products from "Nature's Plus," which I know from publicly available information is a brand that is part of "Natural Organics Inc." located in Melville, New York.   Great Health and Nutrition additionally receives products from "Super Natural Distributors," which I know from

6

2020R00251

publicly available information is located in Waukesha, Wisconsin. Accordingly, I know from information provided by Great Health and Nutrition and its owner, JR, as well as from publicly available information about Great Health and Nutrition's various inventory suppliers, that Great Health and Nutrition is a business that has routinely received products that travel in interstate commerce into the State of Minnesota from elsewhere.

15.     On June 3, 2020, an ATF Special Agent and Certified Fire Investigator, along with several other members of the investigation team, examined the Great Health and Nutrition store. The ATF's initial examination revealed the business had been secured with plywood. ATF investigators observed that the glass entry door and one window on the front of the business had been broken, along with damage to the entry door itself.   ATF investigators also observed that laminate particleboard shelving units lined the interior walls of the business. Along the east interior wall ATF investigators observed one of the shelving units sustained fire damage in the form of charring, discoloration, and soot and smoke deposits to the upper two shelves, as well as charred paper on these shelves. ATF investigators observed that the wall behind the shelving unit also sustained fire damage in the form of charring, discoloration, and soot and smoke deposits.  Based upon their observations on the scene together with their training and experience, ATF investigators eliminated any natural or accidental causes of fire in the area of the shelving unit. ATF investigators also observed light smoke deposits on the HVAC air intakes and discharge vents located in the drop ceiling. Based on the scene examination, as well as a subsequent

7

2020R00251

see, among other things, taking inventory, damaging property, and setting a fire. JR provided ATF with a copy of the May 28, 2020 video surveillance footage, which includes two separate video files: (1) a video with a filed named in part "20200528_195153" that is approximately 2 minutes 35 seconds in duration ("Video 1"), which is chronologically followed by (2) a video with a file named in part "20200528_195527" that is approximately 3 minutes 48 seconds in duration ("Video 2").

18.     ATF investigators have reviewed the video surveillance footage concerning Video 1. ATF investigators observed the following individuals, as non-exhaustively summarized below:

(a)     A white male wearing a green and black hoodie, dark colored pants and black tennis shoes who, as discussed below, has subsequently been identified as defendant FREY. He has dark brown hair, the top of which is pulled into a band. Defendant FREY is carrying a black backpack with a yellow design on the front.

(b)     Co-Conspirator 1 is a white female wearing a black tank top, black pants and light colored Converse-style tennis shoes. Co-Conspirator 1 has light brown shoulder length hair and was carrying a two toned gray backpack.

(c)     Co-Conspirator 2 is a white female with brown hair wearing a black T-shirt, black pants and black tennis shoes.

9

2020R00251

(d)     Co-Conspirator 3 is a white female with blond hair pulled back

into a pony tail, wearing a gray crop top, black leggings, and black tennis shoes.

Multiple tattoos are visible on Co-Conspirator 3's arms.

19.     Based upon ATF agents' review of Video 1, defendant FREY, Co-

Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3 are together inside the Great

Health and Nutrition store when Video 1 begins, and thereafter the following things

occur, as non-exhaustively summarized below:[1]

- At the approximately 0:01 time mark, defendant FREY and Co-Conspirator 1 appear to turn their heads and gaze towards the store entryway, apparently concerned with onlookers who may see their activity inside the store.

- At the approximately 0:18 time mark, Co-Conspirator 2 throws Co-Conspirator 1 multiple beverages from a refrigerator while Co-Conspirator 1 laughs.

- At the approximately 1:11 time mark, Co-Conspirator 2 asks Co-Conspirator 1, "do I still have milk in my eye?" Co-Conspirator 1 then approaches Co-Conspirator 2, gets close, and looks at her face from approximately one foot away.

- At approximately the 1:36 time mark, a female co-conspirator tells an unknown individual off camera that "there's nothing in here," and defendant FREY asks that unknown individual if there are any stores with anything left. When told there is nothing left, defendant FREY turns and breaks a glass display case which causes the co-conspirators to cheer. One of the co-conspirators then yells, "Do another one!" Defendant FREY walks to the front and breaks another display case.

- At approximately the 1:55 time mark, defendant FREY breaks the front display case with a stick. Co-Conspirator 3 says "bro," smiles at defendant FREY, and then throws an unknown item at defendant FREY.

---

[1] This affidavit contains summaries of some of the words that can be heard in Video 1 and Video 2. These are not intended to be verbatim transcripts.

10

2020R00251

- At approximately the 2:11 time mark, one of the co-conspirators exclaims, "Do ya'll need some masks" as unknown individuals enter the store. Defendant FREY then grabs blue medical face masks sitting in the front display case. Co-Conspirator 1 states to defendant FREY, "hand me, hand me." One of the co-conspirators asks "do you need a mask?" Co-Conspirator 1 apparently states to defendant FREY "hand them to me" and then apparently states words to the effect of "so that I can hand them out." Defendant FREY hands Co-Conspirator 1 the face masks, and she places them in her backpack.

- At approximately the 2:26 time mark, Co-Conspirator 2 can be heard asking (while holding a can that bears the resemblance of a Red Bull can), "isn't Red Bull flammable?"

- At various points in Video 1, two other unknown individuals can be seen entering the store for a short duration and then departing with minimal (if any) interaction with defendant FREY and the other co-conspirators.

20.    During the course of the activity depicted in Video 1, defendant FREY and the other co-conspirators described above are joined by Individual A. Individual A is a white male with dark brown hair wearing a blue baseball hat (with sunglasses affixed to it), a Hawaiian style button down shirt, dark colored shorts, gray shoes, carrying a dark colored back pack.

21.    ATF investigators also observed Video 2, which, according to store owner JR, is video footage that picks up chronologically almost immediately after the footage that JR recorded in Video 1. A digital still frame image from Video 2 is shown below that includes the co-conspirators together with Individual A:

11

2020R00251



22.   ATF's further review of the May 28, 2020 video surveillance footage

revealed the following about the five individuals' conduct within Great Health and

Nutrition, as non-exhaustively summarized below:

- At approximately the 0:25 time mark, the co-conspirators and
Individual A discuss having "Fifty bowls," apparently because they had
"raided the fucking tobacco shop" in reference to the St. Paul Midway
location by the Target and Cub (Note: On June 3, 2020, I spoke with
K.A., the owner of Midway Tobacco Outlet Plus, who confirmed his store
had been looted during the riots).

- At approximately the 1:00 time mark, defendant FREY hands Co-
Conspirator 1 a pipe that he had just been smoking.

- At approximately the 1:01 time mark, one of the female co-conspirators
says, "who's got a lighter?"

- At approximately the 1:11 time mark, at least two of the co-conspirators
state in apparent unison something about "lighting this bitch up."

- Seconds later, at approximately the 1:14 time mark, defendant FREY
has what appears to be hand sanitizer in his left hand, takes the

12

2020R00251

cap/plunger off and pours it onto the shelf on the ground. One of defendant FREY's co-conspirators states, "We're lighting this bitch up, bro." One of defendant FREY's co-conspirators then talks about hand sanitizer.

- At approximately the 1:17 time mark, some of the co-conspirators are visible knocking over shelving units onto the floor as one of defendant FREY's co-conspirators states, "We don't got to worry, it'll all be burned." Also, at this point, a female co-conspirator's voice and a male voice can be heard inquiring, "Do you have any lighters?"

- At approximately the 1:31 time mark, Co-Conspirator 2 knocks over a shelving unit.

- At approximately the 1:34 time mark, defendant FREY can be seen using a lighter to light paper on fire, places it on the area where he previously spread the contents from a clear bottle and then takes bottles he finds on the counter and spreads the contents on the same area. A female co-conspirator can then be heard telling the others nearby, "He's, uhhh, lighting… dropping fire…" While defendant FREY is lighting paper on fire, Co-Conspirator 1 is sitting on the ground within arms-reach.

- At approximately the 1:58 time mark, Co-Conspirator 2 pours out onto the ground a liquid from a can consistent in appearance with a Red Bull energy drink, apparently attempting to widely disperse the contents on the floor. (Note: In Video 1, Co-Conspirator 2 had previously inquired "isn't Red Bull flammable?").

- At approximately the 2:08 time mark, defendant FREY is seen using a lighter to light an apparent magazine on fire. A co-conspirator says, "…don't light this bitch up yet."

- At approximately the 2:14 mark, after apparently lighting the magazine on fire, defendant FREY immediately turns towards the shelving unit that ultimately sustained fire damage. Defendant FREY is seen standing and moving in front of the bookshelf, but the activity of his hands are obscured from the approximate 2:14 time mark to the approximate 2:28 time mark.

- At approximately the 2:16 time mark, a female co-conspirator says ". . . don't light it on fire." Another female co-conspirator responds, ". . . you have like five minutes . . . until I can figure out how to get this bitch burned."

13

2020R00251

- At approximately the 2:28 time mark, defendant FREY steps away from the shelving unit. Co-Conspirator 1 then grabs an unknown liquid bottle from a counter and approaches the shelving unit, apparently in tandem with defendant FREY.

- At approximately the 2:36 time mark, a female co-conspirator announces, "He lit the fire!"

- At approximately the 2:39 time mark, defendant FREY and Co-Conspirator 1 together momentarily step away from the shelving unit and look towards the store's entryway.

- At approximately the 2:45 time mark, a female co-conspirator yells, "Ya'll, we gotta hurry the fuck up!"

- At approximately the 2:46 time mark, defendant FREY and Co-Conspirator 1 return to the shelving unit.

- Defendant FREY and Co-Conspirator 1 are seen standing and moving around together in front of the shelving unit, with the activity of their hands obscured from the 2:49 time mark to the 2:59 time mark. At least some of the time, Co-Conspirator 1 appears to be standing on her tip-toes, consistent with attempting to maneuver her hands high above her head towards the direction of the shelving unit. (Note: At least some shelving unit fire damage was on the top shelves, according to the inspection by ATF personnel).

23.    Near the end of Video 2, defendant FREY can be seen taking at least five bottles from the counter and placing them in his backpack. These bottles appear to be the same ones that defendant FREY and Co-conspirator 1 had in their hands when they were near the shelving units that ATF inspectors subsequently determined sustained fire damage. According to RT (the owner the Great Health and Nutrition store), these bottles located on his counter (the contents of which were dumped upon the certain surfaces within RT's store by at least defendant FREY, according to the May 28, 2020 surveillance video) are bottles of "Uncle Bud's Organic

14

2020R00251

Hemp Seed Oil Hand Sanitizer." Based upon pictures of those particular Uncle Bud's bottles (which I have reviewed), they contain a written warning which reads, in part, "Flammable. Keep away from heat or flame."

24.    As noted above, on June 3, 2020, an ATF Special Agent and Certified Fire Investigator inspected the Great Health and Nutrition store and observed charring, discoloration, and soot and smoke deposits that he determined were the result of non-accidental application of an open flame to combustible. The charring, discoloration, and soot and smoke deposits are located specifically in the area of the Great Health and Nutrition store where, according to the surveillance video footage in Video 2, defendant FREY is shown lighting a fire.

### Identification of Defendant Frey

25.    During the late afternoon on Friday, June 5, 2020, ATF issued a press release and provided local media with certain images of the co-conspirators along with a request for any tips or identifying information from the general public. Shortly thereafter, the request for tips and the images were provided to the general public. In response, during the evening of June 5, 2020—and continuing into Saturday, June 6, 2020, ATF received multiple anonymous tips from members of the public, each of which identified defendant FREY as the male in the green sweatshirt described above.

26.    ATF personnel also identified images from a Facebook account in the name of "Sam Frey" that contain the following images from May 28, 2020:

15

2020R00251



These May 28, 2020 Facebook images, at least one of which indicates a time stamp of 18:31 hours, appear to depict at least one of the female co-conspirators. Also, one of these Facebook images shows part of defendant FREY's face and his hooded green sweatshirt and backpack strap, which appear to be the same attire that defendant FREY wore in the Great Health and Nutrition store, as per the footage in Video 1 and Video 2.

27.   On Saturday, June 6, 2020, in response to the ATF request for public tips concerning the co-conspirators, ATF received a notification from the Brooklyn Park Police Department.   More specifically, Brooklyn Park Police Department provided ATF with a police report, which shows that on May 30, 2020, at 7:57 a.m., two officers responded to a call about a dispute at the **Subject Residence**. According

16

2020R00251

to that police report, the caller (a relative) met at the **Subject Residence** with the officers and told them, among other things:

- The relative is having some issues with ... Samuel Frey.

- Frey is 19 years old.

- Frey went to the riots in downtown Minneapolis last night.

- The relative believed that Frey contributed to the violent looting and stole some property.

- Frey had stolen property on him and he has no explanation on how he got this property other than looting stores.

- This kind of behavior is not acceptable.

28.  The Brooklyn Park Police Department report also shows that the officers spoke with defendant FREY in the basement bedroom at the **Subject Residence**. According to the responding officers' report, other family members reside with defendant FREY at the **Subject Residence**, but the bedroom basement is where defendant FREY resides specifically within the **Subject Residence**. According to the report, defendant FREY acknowledged getting certain property from "riots," which he knew was "wrong," but defendant FREY "didn't want to talk to officers in depth about what exactly had occurred last night because he's been up for 24 hours rioting and looting and he's tired now." Per the police report, after defendant FREY indicated that he did not have a problem with the police taking property, the responding officers seized items that defendant FREY took. Brooklyn Park Police Department officers left the **Subject Residence** and took no further action concerning defendant FREY, who remained at the **Subject Residence**.

17

2020R00251

29. Based on my training, experience and participation in criminal investigations, I know that those involved in criminal activities keep items related to their unlawful activities (such as unlawfully obtained property) in their residence or places they frequent, as shown during the aforementioned Brooklyn Park Police Department when officers recovered certain stolen goods from the **Subject Residence**. Also, based upon my training, experience, and participation in criminal investigations, I know that those involved in criminal activities keep evidence of their unlawful activities (such as clothing or accessories) in areas of a residence where they have exclusive access and control, such as a bedroom, as well as in other areas where they have joint access, such as a bathroom or a laundry room. More specifically, on June 8, 2020, an ATF agent spoke with one of the Brooklyn Park police officers who responded to the **Subject Residence** on May 30, 2020. According to that officer, she observed that defendant FREY had access to areas throughout the **Subject Residence** in addition to his basement bedroom. As non-exhaustive examples, the responding officer observed on May 30, 2020, that defendant FREY came up from his basement bedroom to, among other things, use a bathroom on the main level, enter a main level bedroom (that the officer understood to be the bedroom of defendant FREY's sister), and to be in the general living area of the main level (which the officer observed to be an open floor plan). Also, based on my training, experience and participation in criminal investigations, I know that individuals keep their cellular telephones on or near their persons. Moreover, as indicated above, Facebook

18

2020R00251

photographs show that defendant FREY possessed a cellular phone on May 28, 2020, which he appears to have used to photograph some of his activities.

### Additional Information Concerning Cell Phones

30.     Based on my training, experience and participation in criminal investigations, I know that cellular telephones may be capable of being used as more than merely a telephone. Cellular telephones may be capable of storing and/or processing data in digital form as well as used to facilitate voice and SMS text messaging communications. Cellular telephones may have a digital camera attached, and may be used to create and store photographs, audio files, and video files. Cellular telephones may also be capable of accessing the internet and acting as a geographic location device. Although some of the stored electronic data called for by this warrant might be found in the form of user-generated documents (such as photograph and video files), the device can contain other forms of electronic evidence as well. In particular, records pertaining to or tending to show how cellular telephones have been used, what they have been used for, who may have used them, and who may have been responsible for creating or maintaining records, documents, programs, applications and materials contained on cellular telephones are called for by this warrant.

31.     As demonstrated by the May 28, 2020 photographs on defendant FREY's Facebook page, cellular telephones may contain photographs or videos of individuals who have engaged in unlawful activity and/or photographs or videos of their co-conspirators. These photographs and videos often contain evidence of criminal

19

2020R00251

activities. Further, these photographs and videos are useful to identify associates and co-conspirators of the primary user of the telephone, as well as other evidence of illegal activities. Based on my experience and training, I know that those engaged in criminal activity commonly possess and use digital devices such as cellular telephones in connection with their illicit activities. These devices typically store relevant information concerning their illegal activities and associates including addresses and telephone numbers, text messages, the times and dates of incoming and outgoing calls and messages, and electronic files such as photographs, and videos.

32. In addition, I know from my training and experience that cellular telephones, in addition to being communication devices, are also storage devices for data. Data electronically stored inside cellular telephones include telephone numbers of associates, logs of the date and time that individual calls were made, voice and text messages from associates and photographs or videos of the primary user, associates, and co-conspirators. The data inside cellular telephones is evidence of criminal activity and can be effectively used to corroborate the statements of witnesses.

20

2020R00251

## CONCLUSION

33.     Based on the above information, I believe there is probable cause that defendant SAMUEL ELLIOTT FREY, Co-Conspirator 1, Co-Conspirator 2, and Conspirator 3 have conspired with each other to commit arson on property used in interstate commerce, in violation of Title 18, United States Code, Section 844(i), all in violation of Title 18, United States Code, Section 371 (Count 1); and that defendant SAMUEL ELLIOTT FREY has attempted to destroy by fire property used and engaged in interstate commerce, in violation of Title 18, United States Code, Section 844(i) (Count 2).

34.     Also, based on the above information, I believe there is probable cause to believe that evidence, fruits, and instrumentalities, as further described in Attachment B, can be found at the **Subject Residence**, as further described in Attachment A.

Dated: June 8, 2020                    Respectfully submitted,

Laura Gulick
Special Agent
Bureau of Alcohol Tobacco & Firearms

SUBSCRIBED and SWORN to before me by reliable
electronic means (FaceTime and email) pursuant to
Fed. R. Crim. P. 41(d)(3) on this __ day of June 2020.

The Honorable Hildy Bowbeer
United States Magistrate Judge

21