UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 20-CR-129-1 (NEB/HB)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **POSITION OF UNITED STATES** |
| v. ) | **REGARDING SENTENCING** |
| ) | |
| SAMUEL ELLIOTT FREY, ) | |
| ) | |
| Defendant. ) | |

The United States of America, by its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Assistant United States Attorneys Matthew S. Ebert and Joseph S. Teirab, hereby submits its position regarding sentencing.

I. **SAMUEL FREY'S MAY 28, 2020 ARSON IN ST. PAUL'S MIDWAY AREA AND RELATED PATTERN OF LAWLESS MISCONDUCT**

In late May 2020, the murder of George Floyd led to widespread protest in the Twin Cities area. While many protested and assembled peacefully, others—like Samuel Frey—unfortunately used the tragedy to engage in mindless destruction against innocent neighborhoods and small businesses through arson, violence, and looting.

On May 28, 2020, Frey and three others (including co-defendant Ms. DeGidio Dunn and C.F., Frey's minor sibling) joined a crowd of people who had gathered near a commercial strip mall at the intersection of University Avenue and Hamline Avenue in the Midway area of St. Paul, Minnesota. (PSR at ¶ 10.) When Frey arrived on that scene, other individuals were already engaged in efforts to trespass, loot, and

set fire to businesses and buildings. (*Id.*) Frey immediately joined those lawless and destructive efforts underway, which, as discussed below, was actually part of a continuous pattern of misconduct that Frey embarked on before, during, and after his arson on May 28, 2020.

Specifically, Frey and his associates trespassed in and out of multiple business before eventually entering into the Great Health and Nutrition Store, an independent supplement retailer, located within a commercial strip mall near University Avenue. (*Id.* at ¶¶ 10-11.) Unbeknownst to Frey, the owner of the Great Health store, J.R., had earlier fled the scene but watched from afar in real time with shock and dismay via a live-stream video surveillance camera. J.R. could only helplessly watch the misconduct of Frey and his group that unfolded in his store. At one point, Frey smashed display cases while his associates cheered. (*Id.* at 12.) An individual in Frey's group twice said, "We're lighting this bitch up," in reference to J.R.'s store. (*Id.*) Frey opened a bottle of hand sanitizer and poured the contents on shelving units that he and C.F. knocked down, as C.F. said, "We don't got to worry. It'll all be burned." (*Id.* at ¶ 13.)

At one point, Frey used a lighter to set a sheet of paper on fire and placed the flaming paper onto the area of the downed shelving unit where he had poured hand sanitizer. (*Id.*) Next, Frey used a lighter to set a magazine on fire and approached another shelving unit. (*Id.* at ¶ 14.) Frey said, "You have like five minutes ... until I can figure out how to get this bitch burned." (*Id.*) Frey then placed the flaming magazine onto the shelving unit. (*Id.*) Frey had a bottle of hand sanitizer, and he

both poured the contents onto the shelving unit to accelerate the fire. (*Id.*) Frey momentarily stepped away from the shelving unit to look towards the store entryway and then returned to apply additional hand sanitizer. (*Id.*) After Frey and his associates exited and walked away from the Great Health and Nutrition Store, Frey discussed his setting of the fire and even remarked how "fun" it had been to do so. (*Id.* ¶¶ 15, 24.)

Fortunately, the fire started by Frey at the Great Health and Nutrition Store eventually self-extinguished. (*Id.* ¶ 16.) J.R.'s business nonetheless suffered damage throughout as a direct result of Frey. An ATF Special Agent and Certified Fire Investigator examined the store and determined that a shelving unit along an interior wall, as well as the wall itself, sustained fire damage in the form of charring, discoloration, and soot and smoke deposits. (*Id.*) The Certified Fire Investigator also observed light smoke deposits on the HVAC air intakes and discharge vents located in the drop ceiling. (*Id.*) Also, water damage impacted virtually all of J.R.'s business due to overhead sprinklers that went off in reaction to the fire started by Frey.

As the Court has already heard, the damage wrought by Frey's conduct upon the victim business owner, J.R., is far more destructive than simply the financial impact. Moreover, Frey's conduct did not simply victimize the small business, but it also damaged the broader community and left neighborhood employees out of work, as J.R. stated below:

> The destruction and arson of my store happened at a time in my life that should have been one of the most joyful, the birth of our first grandchild. Instead of being totally able to enjoy and fully participate I found myself having to deal with clean up, insurance and contractors, all of which are very frustrating and

time consuming. Our 33 year old neighborhood business was shut down and my neighborhood employees out of work. The community no longer had access to health products, in particular immune products, during a pandemic. Having watched it take place on a live stream further added to my anxiety and I now relive it, often particularly in my dreams. I suffer from PTSD and am always thinking it will be repeated. I do not sleep well and it has effected my mood and outlook and how I look at people. To say this has impacted me is a[n] understatement to say the least.

*See* Dkt. 85 (Victim Impact Statement of J.R.).

Frey's arson is but one part of a course of destructive looting and criminality that Mr. Frey engaged in during the waning days of May 2020. For example, on May 30, 2020, officers with the Brooklyn Park Police Department responded to a call from one of Frey's parents, who indicated that Frey "went to the riots in downtown Minneapolis last night." (PSR ¶ 19.)  According to the police report, the parent "believed that [Frey] contributed to the violent looting and stole some property" because "[Frey] had numerous amounts of stolen property on him" and "he has no explanation on how he got a hold of this property other th[a]n [sic] looting stores." (*Id.*) The police report further indicates that officers spoke with Frey in the basement bedroom, who "indicated that he did get the property from last night[']s riots in Minneapolis and knew that it was wrong." (*Id.*)  Frey also said that he "didn't want to talk to officers in depth about what exactly had occurred last night because he's been up for 24 hours rioting and looting and he's tired now." (*Id.*)

A video on Frey's cell phone depicts Frey in a car on May 27, 2020, along with at least two banker's envelopes containing large amounts of cash. (*Id.* ¶ 22.)  Frey exclaimed, "You bitches are dumb. If you went to Cub and Target, ya'll didn't even

4

check your fucking safes.  So now I walked out with all your fucking money" and "Look what I got at the robbery!"  (*Id.*)

In addition, Frey engaged in a series of text messages from May 27, 2020, to May 30, 2020, which reveal the extent of Frey's brazen spree of misconduct in the days surrounding the Great Health arson:

- On May 27, 2020, at 9:42 pm, C.F. texted Frey, "do you wanna go to the protest first than [sic] drink with [d] and his friend?" and Frey replied, "you mean the fire that's at the target."

- On May 27, 2020, at 10:12 pm, Frey texted "[AS]," and stated, "I have keys to everything locked . . . We're grabbing money" . . . "We're going to the safe" and later stated, "there's over 200,000 in cash at all targets I'll give you 10 bands…We gonna hit this bitch HARD."

- On May 27, 2020, at 11:16 pm, Frey texted [AS] and stated, "We're here [in apparent reference to the Target].  We're trying to get through the police."  At 11:41 pm, Frey again texted [AS] and stated, "Wya [where you at]… We got iPads."

- On May 28, 2020, at 12:27 am, Frey texted [AS] and stated, "We found the safe...It's open...With Cash."  Later texts between C.F. and Frey discuss money with Frey texting "like ngl y'all wouldn't have shared the 400 with us which would've been fine with me."

- On May 28, 2020, at 6:31 pm, Frey's location data was recorded and placed him at the southwest corner of Syndicate Street North and University Avenue West.  Shortly after, Frey took several photos and videos of law enforcement and fire personnel in St. Paul.

- On May 28, 2020, at 9:48 pm, Frey texted [RK] and said, "I stole so much shit from Verizon…and fucking foot locker" in "Saint paulllll" and that the "riot was there."

- On May 28, 2020, at 10:12 pm, Frey texted [RK], "I set fire to a store" and "It's still going."  In apparent reference to items he stole, Frey texted that he "filled like 7 garbage bags."  When [RK] asked if Frey was "selling it or keeping all of it what you get from Verizon," Frey responded, "It's mostly cases[.] we have a few iPads and iPhones but they have the demo software and I have to hack it and try to get it removed."  From Footlocker, Frey texted [RK] that he got

5

"Hella shoes … Like 11 pairs … Jordan's … Adidas … Nike." [RK] texted in response, "Omg Bestfriend please bring me something," to which Frey replied, "Come with Saturdayyyy … To target … There [sic] not gonna arrest you." The next day (May 29, 2020), [RK] texted Frey that she "was interested in buying one of them phones off you," and Frey responded "400 … That seem fair? … I throw in a iPad."

- On May 29, 2020, at approximately 10:38 pm, Frey and C.F. texted about bringing crates in from outside with Frey stating he had "fire sticks…echo spots…these amazon displays… we raised [sic] the post office."

- Throughout the late evening hours and early morning of May 29, 2020, to May 30, 2020, Frey and C.F. texted about bringing crates in from outside, and photos taken by Frey place them down in Minneapolis during the evening hours.

- On May 30, 2020, Frey told C.F., "There [sic] looting…Hurry… W [Lake] & Grand Ave S." Frey texted the address "[XXXX] S Garfield Ave., Minneapolis" several times to multiple contacts.

- On May 30, 2020, at approximately 6:35 am, C.F. texted Frey that "[J] is mad and wants the stolen goods out of the house."

(*Id.* ¶ 23.)

After Frey's May 28, 2020 arson, investigators issued a press release seeking information from the public regarding the identification of the individuals involved in the arson and damage at the Great Health store, among other properties. (*Id.* ¶ 18.) In response to investigators' efforts, Frey communicated with Ms. DeGidio Dunn and C.F. (*Id.* ¶ 17.) Specifically, Frey instructed them to be untruthful to law enforcement by falsely reporting that another person started the fire. (*Id.*) At the time Frey provided these instructions to falsely implicate an innocent party, Frey knew this information was materially false. (*Id.*)

6

II.     **PROCEDURAL HISTORY AND SENTENCING GUIDELINES CALCULATIONS.**

As a result of his conduct, Frey was arrested on June 8, 2020, pursuant to a criminal complaint charging him with conspiracy to commit arson, in violation of 18 U.S.C. §§ 371 and 844(i). (*See U.S. v. Frey, et. al,* 20-mj-365 (HB)). Subsequently, on July 28, 2020, Frey was charged in a superseding indictment involving the same conspiracy violation as well as arson. (PSR ¶ 1; Dkt. 39.) On July 20, 2021, Frey pled guilty to the superseding indictment's conspiracy charge pursuant to a plea agreement. (PSR ¶ 3; Dkt. 101.)

As set forth in the PSR, the **base offense level is 20** for the offense of conviction (conspiracy to commit arson) pursuant to U.S.S.G. §§ 2X1.1(a) and 2K1.4(a)(2)) because the offense involved the attempted destruction of a structure other than a dwelling or specified facility. (PSR ¶ 34.) The offense level is **increased by 2 levels** pursuant to § 3B1.4 because Frey used or attempted to use a minor to assist in the commission of the offense and in avoiding detection of the offense. (*Id.* ¶ 36.) The offense level is **increased by 2 levels** pursuant to § 3C1.1 because Frey willfully attempted to obstruct or impede the administration of justice with respect to the investigation of this offense when he instructed others to lie to law enforcement by falsely reporting that another person had started the fire. (*Id.* ¶ 39.) The offense level is **decreased by 3 levels** pursuant to § 3E1.1(a) and (b) because of Frey's acceptance of responsibility. (*Id.* ¶¶ 42-43.) Thus, with a criminal history category of I, the **total offense level is 21**, which results in an **advisory Guidelines range of 37 to 46 months of imprisonment**. (*Id.* ¶¶ 44, 81.)

The provisions of the Mandatory Victims Restitution Act apply to this offense pursuant to 18 U.S.C. § 3663A, and restitution shall be ordered for Frey in an amount to be determined by the Court. (PSR ¶¶ 20, 94.) Specifically, as detailed in the PSR, Frey shall be ordered to pay $33,826.64 in restitution, which shall be comprised of:

- $32,826.64 to the victim insurer (of which amount $30,579 is joint and several with Ms. DeGideo Dunn) and $2,247.64, for which Frey is solely liable; and

- $1,000 to victim J.R. (joint and several liability with Ms. DeGideo Dunn).

(*Id.* ¶ 92.)

### III.  SENTENCING FACTORS WARRANT A CUSTODIAL SENTENCE

As further addressed below, the government requests that the Court sentence Frey to 37 months' imprisonment at the low end of the Guidelines, which the government respectfully asserts is appropriate in light of the sentencing factors under 18 U.S.C. § 3553 most pertinent to this case—namely, (1) the nature and circumstances of Frey's offense; (2) Frey's history and characteristics; (3) the need for the sentence to promote respect for the law and to afford adequate deterrence; and (4) the need for a sentence that will ensure Frey receives appropriate treatment and counseling.

#### A. *A Custodial Sentence Will Reflect the Seriousness and the Nature and Circumstances of Frey's Arson Offense.*

Frey's crime was incredibly serious. His arson took place on the heels of the tragic murder of George Floyd. However, Frey's actions were in no way an expression of peaceful protest or lawful demonstration—far from it. Frey's conduct was lawless,

dangerous, and destructive. His senseless crime undermined and distracted from the many who tried to protest peacefully. Frey had the clear purpose of trying to destroy and to burn the Great Health store. He casually walked through J.R.'s store as he smashed glass display cases, toppled shelving units, and lit flames as he blithely tried (in his words) to "figure out how to get this bitch burned." (PSR ¶ 14.)

Thankfully, Frey's intention to commit arson was not fulfilled despite his efforts to the contrary. However, the consequences of his arson could easily have been catastrophic, even lethal. The whole strip mall in which the Great Health store was located could have been engulfed. To be clear: an aggravating factor is that Frey's intentional and callous actions risked the lives of anyone who was in the area, the safety of first responders, and most concretely, the livelihood of a small business and its employees. J.R.'s statement certainly makes clear that the lasting, damaging impacts of Frey's crime will not soon subside. (Dkt. 85.)

Additionally aggravating is that Frey committed this offense by ensnaring his own sister, a minor, and having her commit the offense with him. Compounding his already serious crime, Frey obstructed justice by egregiously instructing others (including a minor) to falsely implicate an innocent party in order to shield Frey from getting caught for his own crime.

Frey's arson was not simply a fleeting moment of bad judgment. Rather, it was part of a multi-day pattern of theft, destruction, and looting, all of which culminated with his effort to get others to lie for his own selfish benefit. Accordingly, the

government respectfully submits that a term of incarceration is necessary to punish this serious crime.

### B. *A Custodial Sentence Will Account for Frey's History and Characteristics.*

The PSR notes that Frey reported a very difficult childhood and upbringing, marked by bullying at school, tumultuous living arrangements, and abusive relationships. The government in no way seeks to trivialize those circumstances in Frey's life that have left him in anyway victimized or marginalized. However, there are many others who endure such hardships, but unlike Frey, they do not similarly resort to crime and reckless conduct that victimizes others. Moreover, it is not clear from the record whether, in fact, all of the challenges Frey has faced before and after this arson crime necessarily occurred as he has indicated. It bears emphasis that Dr. Garrity—who extensively examined Frey in these proceedings—has concluded that Frey displays a "noncredible and/or unreliable pattern of symptom report" and is "an unreliable historian and uncorroborated information should be considered with that limitation in mind." (PSR ¶ 67). As such, given Frey's observed lack of credibility and reliability when it comes to his descriptions of himself, it is unclear which issues in his life might present genuine mitigating circumstances.

What is clear from the record, however, is that Frey committed this arson as part of a multi-day binge of unbridled lawless behavior. In so doing, he revealed much about himself, such as a lack of respect for the law and a flagrant disregard for the well-being of others. Frey appeared to relish committing such destruction. Hours after trying to burn J.R.'s Great Health business, Frey boasted, "I set fire to a store,"

10

and "It's still going." (*Id.* ¶ 23.) Shockingly, setting the fire was "fun" to Frey. (*Id.* ¶ 24.) Frey's numerous other text messages similarly show the obvious glee he took with his criminal exploits in late May 2020, as he encouraged others to join him. Astonishingly, even when local officers were in his bedroom to respond to a parent's call about Frey's conduct, Frey's disrespect and selfishness were on full display as he could barely be bothered since he was "tired" having "been up for 24 hours rioting and looting." (*Id.* ¶ 19.) Frey's characteristics in late May 2020 reveal a troubling picture of a person who—absent a serious course correction—will likely continue apace down the wrong path.

The government respectfully submits that a term of incarceration at the low end of the Guidelines range will account for Frey's history and characteristics and will supply a much-needed course correction to his life.

### C. *A Custodial Sentence Appropriately Reflects the Need for the Sentence Imposed to Afford Adequate Deterrence and Promote Respect for the Law and Will Ensure that Frey Receives Counseling and Treatment*

Frey has struggled to abide by his release conditions, which suggests he remains undeterred. After Frey was released to a halfway house on June 16, 2020, he violated the facility's rules on multiple occasions (including using or possessing alcohol on the premises) such that he was unsuccessfully terminated from the halfway house in October 2020 following a pretrial violation hearing. (PSR ¶ 3.) Thereafter, Frey's release conditions were modified to include home detention at his father's residence. (*Id.*) Since that time, Frey has continued to submit positive tests for marijuana. (*Id.*) This is a troubling record. It raises the real concern that Frey

11

has not learned from his actions and has not acquired any respect for the law and that, consequently, he might resort to more (and worse) crime if he does not receive a sufficient punishment.

Frey's substance abuse issues additionally underscore the importance of a sentence that will provide him with needed treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2)(D). Frey has several mental health conditions (PSR ¶ 65), and he will benefit from all appropriate treatment and counseling (as well as any substance abuse treatment). Accordingly, the government requests that Frey be ordered to receive counseling and treatment from the BOP and while on supervised release.

## CONCLUSION

For the reasons set forth above, the government respectfully recommends that the Court sentence Frey to a term of imprisonment at the low-end of the Guidelines range with treatment and counseling and order him to pay restitution in the amount of $33,826.64.

Dated: December 30, 2021　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　CHARLES J. KOVATS, JR.
　　　　　　　　　　　　　　　　　　　　　　Acting United States Attorney

　　　　　　　　　　　　　　　　　　　　　　/s/ *Matthew S. Ebert*
　　　　　　　　　　　　　　　　　　By:　　MATTHEW S. EBERT
　　　　　　　　　　　　　　　　　　　　　　JOSEPH S. TEIRAB
　　　　　　　　　　　　　　　　　　　　　　Assistant United States Attorneys